## No. 12,309.

### CITIZENS AND TAXPAYERS OF DE SOTO PARISH VS. GOODE B. WILL-IAMS, PRESIDENT POLICE JURY, ET ALS.

The provisions of Arts. 209 and 242 of the Constitution being upon the same subject matter, the incrasee of *ad valorem* taxation upon property within the parishes and municipalities of the State, same are laws *in pari materia* and must be construed together.

What is meant by the phrase " by a vote of the majority of the property taxpayers in number and in value" occurring in Art. 242, is a majority of the property taxpayers actually present and voting at an election.

All qualified property taxpayers who absent themselves from an election duly called, are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares.

APPEAL from the Ninth Judicial District Court for the Parish of De Soto.  *Hall, J.*

*Scarborough & Carver* for Plaintiffs, Appellees.

*Alexander & Blanchard (Wm. Goss* of Counsel) for Defendants, Appellants.

Argued and submitted January 19, 1897.
Opinion handed down February 15, 1897.
Rehearing refused March 15, 1897.

The opinion of the court was delivered by

WATKINS, J.   About twenty alleged citizens and taxpayers of the

parish of De Soto entered suit against the Kansas City, Shreveport
& Gulf Railroad Company, the president of the police jury of that
parish, and the board of supervisors thereof, and demanded that the
ordinance of said police jury directing an election to be held for the
purpose of taking a vote on the question of levying a special tax of
five mills upon the assessed valuation of all property within said
parish, for the use and benefit of said railroad company, and the
declaration of the result of the election as being in favor of the tax
by said board of supervisors, be declared null and void; and the
prayer of their petition is that the court declare and decree that the
aforesaid election, which was held on the 2d of December, 1895, did
not result in favor of the tax, and that they be relieved from all
obligations and burdens resulting therefrom.

After answer filed and trial had there was judgment in favor of
the plaintiffs in conformity to the allegations and prayer of their
petition, and after a motion for a new trial was made and overruled,
the defendants prosecuted this appeal.

The several grounds upon which plaintiffs rest their claims to
relief are, substantially, as follows, viz.:

*First*—That the said election was erroneously ordered, for the
reason that the petition therefor was not signed by one-third of the
property taxpayers of the parish.

*Second*—That the said election was illegal for the reason that the
petition therefor requested that the proposition for the levy of the
tax be submitted to the property taxpayers of the parish, whereas
the police jury ordinance required that it be " submitted to the
property taxpayers of the parish who are entitled to vote under the
laws of the State;" and the ordinance was illegal and void, by rea-
son of its incompatibility with the petition of the taxpayers upon
which it was predicated, and of the fact, that " there was no law at
the time in existence which authorized the police jury to submit a
question of levying a special tax in aid of a railway, to only such
taxpayers as were entitled to vote under the general election laws
of the State," etc.

*Third*—That said election was not carried in favor of the tax,
for the reason that no legal ballots were cast for the tax, same not
conforming to the form of ballots prescribed by the ordinance.

*Fourth*—That the tax was not voted for by a majority in number

and value of the property taxpayers of the parish, in conformity with the requirements of Art. 242 of the Constitution.

With the exception of the third, all the grounds assigned for annulling the ordinance of the police jury calling the election, the proclamation of the result of the election by the board of supervisors, and the ordinance of the police jury levying the tax, are substantially the same; and they proceed upon the theory that the proposition for the levy of the tax was not submitted to the property taxpayers of the parish, but only to those entitled to vote under the election laws of the State.

It must be observed at the outstart of this inquiry, first, that the plaintiffs make no contention as to the qualifications of the persons who voted for or against the tax; second, none that any persons who offered to vote were refused the right of voting; third, and none as to the method of holding the election, or of the manner in which proclamation of the result thereof was made.

Also, that there is no claim made with regard to the right of aliens, or non-residents, to have participated in the election; and no claim is made *to rest upon any statute* of the State—the plaintiff's theory resting exclusively upon an interpretation of Art. 242 of the Constitution.

The District Judge, in disposing of the objection which relates to the form of the ballots that were cast in favor of the tax, said: "There is no difference between the ballot prescribed and that used;" and our examination of the evidence has satisfied us of the correctness of his conclusion.

The crucial question in the case was disposed of by the District Judge very tersely, in the disposition he made of the plaintiffs' second and fifth propositions, which was subsequently elaborated and enlarged, in the course of his reasons for judgment and analysis of authority.

In that of the second, he said:

" This objection loses its force and pith, for the reason that the right to vote was not confined to those taxpayers alone who are authorized to vote under the ' election laws ' of Louisiana, but extended the right to all taxpayers who are entitled to vote under ' the laws ' of Louisiana," etc.

In that of the fifth, he said—quoting it as follows, viz.: "That the tax was not voted for by a majority in number and value of the

property taxpayers of the parish, as required by Art. 242 of the Constitution of the State, and that the tax was therefore not carried "—the evidence shows that at the date of the election there were two thousand four hundred and seven male resident taxpayers in the parish, with an assessment of eight hundred and eighty-three thousand six hundred and seventy-five dollars; and that of this number one thousand and sixty-nine, with an assessment of four hundred and thirty-eight thousand four hundred and forty-eight dollars, voted for the tax, while six hundred and thirty-eight, with an assessment of three hundred and forty thousand five hundred and ninety-eight dollars, voted against the tax.

"It will thus be seen that the tax received a majority in number and amount of the votes cast, but did not receive a majority either in number or amount of the *whole number of resident male taxpayers; though a majority both in number and amount of such resident male voters* participated in the election."

Discarding, altogether, the interpretation of like questions by the courts of many of the States, and of the Supreme Court of the United States, and holding "that this case must be decided by the aid of our own constitutional provisions, in the light of our own jurisprudence," the judge *a quo* said:

"It is true that Art. 242 does not say, in so many words, that it shall require a majority of *all*, whether voting or not, to carry such a tax; and if the article stood alone, and there was no other article authorizing an increase of taxation for any other purpose, the conclusion might be different.   But when we find an express provision in the only other article authorizing an increase of taxation by a vote, that a majority of those voting shall be sufficient, and find no similar words in Art. 242, the conclusion seems inevitable that the omission was intentional, especially when we find it coupled with so many other restrictions in Art. 242 that are not in 209."

In arriving at this conclusion the judge *a quo* appears to have given due attention to all the adjudications of this court upon the subject, and he collated them as follows, viz.: Surget vs. Chase, 33 An. 833; Duperier vs. Viator *et al.*, 35 An. 957; MacKenzie vs. Wooley, 39 An. 944; Sentell *et als.* vs. Police Jury, 48 An. 96—analyzing only the last two; but his analysis of the two articles of the Constitution, taking them in conjunction, is very persuasive, though we can not concur in his conclusion.

Without going into details, or traversing the answer of the defendants *in extenso*, we make from the principal brief of their counsel, the following extract, as fairly stating the contention on which they rely, namely:

" 'A *vote* of the majority,' as used in Art. 242, instead of meaning that a majority of all the property taxpayers in numbers and in value in the parish must vote *affirmatively* for the proposition, means that the *vote given* as a whole must be considered, and if it be found that a majority of such vote is in favor of the tax, then it is carried, otherwise not. How can those who, by abstention from the polls, *do not act* on the proposition, be held to be included in ' *a vote?*' They can not be. The phrase ' a vote,' as used in the article, is synonymous with ' a poll '—a poll of the property taxpayers of the parish—and if a majority in numbers and in value of such ' poll ' be found voting for the tax it is carried. This view not only makes the article practical and effective, but reconciles it with its sister Art. 209, relating to the same subject matter—an increase of taxation, over the general limit, for the purpose of public improvements. Webster defines ' a poll,' in this sense, to be ' a number or aggregate of heads; a list or register of heads or individuals;' also ' the register of the names of electors who may vote in an election.' Therefore, ' a poll,' ' a vote,' includes all who actually cast their votes at the election. Those who stay away are not to be counted in the poll—in the vote."

The facts are few, simple and uncontested.

They are, in substance, as follows, viz.:

At the request of the Kansas City, Shreveport & Gulf Railroad Company, one of the defendants, a special tax was solicited at the hands of the people of the parish of De Soto, to be laid upon the taxable values thereof in aid of the construction of a railroad track through said parish *en route* from Kansas City to the Gulf of Mexico.

Upon petition duly signed as the law requires the question was duly submitted to the property taxpayers of the parish at an election held conformably to law, and with the result, substantially, as stated in the reasons assigned by the District Judge.

After the votes cast had been duly counted and tabulated by the board of election supervisors, another of the defendants, proclamation of the result was made as authorizing the tax.

Thereupon the police jury, another of the defendants, passed an ordinance levying the special five-mill tax voted at the election.

In furtherance of its enterprise the railroad company proceeded to construct its line of railway through the parish of De Soto, as originally contemplated; and, at great expense, had already constructed and completely equipped and outfitted same for many miles, relying upon the avails of said tax, and the laws and jurisprudence of the State interpreting them as they existed at the time.

And, in fine, while the road was in process of construction and the tax in process of collection, this suit was brought for the annulment of the latter.

It is from the standpoint of the aforesaid pleadings, proof and opinion we are invited to review the judgment appealed from.

While the argument at the bar and in the briefs of counsel, on either side, are very elaborate, and more than usually able and instructive to the court, yet, in our conception, the question for decision is narrowed to the compass of the single phrase of Art. 242 of the Constitution, viz.: " By a vote of the majority of the property taxpayers in numbers and in value."

And in determining the true meaning and import of that phrase, we must decide whether a majority of those voting is intended, or a majority of all the property taxpayers, regardless of whether they participated in the election by voting thereat or not.

And just here it must be observed that in the discussion of the case, and in the opinion of our learned brother of the District Court, property taxpayers of the parish of De Soto were alone dealt with.

Inasmuch as this constitutional article is not self-explanatory on this subject, we are constrained to do as the District Judge has done and consult other articles of the organic law upon the same subject matter—increase in the rate of property taxation for public improvement—as well as the jurisprudence applicable thereto, in order to reach a satisfactory solution of the query propounded.

Pursuing this course, we will, in the first place, deal with Arts. 209 and 242, as in pari materia; and in the second place with the latter alone.

I.

The following are the two articles—namely, 209 and 242.

That portion of Art. 209 which relates to the question involved in this case reads as follows:

"No parish or municipal tax, for all purposes whatsoever, shall exceed ten mills on the dollar of valuation; provided, that for the purpose of erecting and constructing public buildings, bridges and works of public improvement in parishes and municipalities the rates of taxation herein limited may be increased when the rate of such increase, and the purpose for which it is intended, shall have been submitted to a vote of the property taxpayers of such parish or municipality entitled to a vote under the election laws of the State, and a majority of same voting at such election shall have voted therefor."

Article 242 reads as follows:

"The General Assembly shall have power to enact general laws authorizing the parochial or municipal authorities of the State, under certain circumstances, by a vote of the majority of the property taxpayers in numbers and in value, to levy special taxes in aid of public improvements or railway enterprises; *provided*, that such tax shall not exceed the rate of five mills per annum, nor extend for a longer period than ten years."

A careful scrutiny of these articles makes it apparent that both appertain to the same subject matter, the increase of parish or municipal taxation beyond the fixed limit of ten mills. Art. 209, occurring under the heading in the Constitution entitled "Revenue and Taxation," lays down *the general prohibition* that "no parish or municipal tax for all purposes whatsoever shall exceed ten mills on the dollar of valuation;" and the subjoined *proviso* states the exceptions thereto, enumerates the character of objects in aid of which the foregoing limitation may be increased and the *modus operandi* of increasing such parochial or municipal tax.

Article 242, occurring under the heading in the Constitution entitled "Corporation and Corporate Rights," contains a general direction to the General Assembly upon the subject of special taxes, and confers upon them "power to enact general laws authorizing the parochial or municipal *authorities* of the State, *under certain circumstances*, to levy special taxes in aid of public improvements or railway enterprises." (Our italics.)

This last article deals with the General Assembly alone, and authorizes them to deal with "parochial and municipal *authorities under certain circumstances;*" and in keeping with this delegation of authority it confers upon the General Assembly "power to enact general laws"

with reference to "special taxes in aid of public improvements or railway enterprises."

It is not denied, on the contrary it is admitted, that the provisions of Art. 209 must be consulted for the purpose of ascertaining the true meaning and import of the phrase " *under certain circumstances,*" occurring in Art. 242, or in orther words, the article conferred power upon the General Assembly to enact laws upon the subject of special taxes *under the circumstances enumerated in Art. 209, which contains the prohibition above referred to.*

And manifestly this is the only correct view to be taken of it, as any other would do away with all constitutional restraint upon the General Assembly in the premises and open the door for the enactment of *any* laws they might deem expedient.

Not only so, but the two articles are, to our thinking, harmonious upon another vital question, the objects for which the rate of taxation may be increased—the phrase in Art. 209 being "for the purpose of erecting and constructing public buildings, bridges and *works of public improvement,*" while that in Art. 242 is " in aid of *public improvements, or railway enterprises.*"

It will not be denied that public buildings and bridges are " public improvements" in the sense of Art. 242, nor will it be denied that a railroad, such as the one of the defendant railway company, is a " work of public improvement" in the sense of Art. 209.

In the two articles of the Constitution succeeding 242 we find the following expressions, namely:

(1) "Any railroad corporation, or association organized for the purpose, shall have the right to construct and operate a railroad between any points within this State, etc., Art. 243; (2) "railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways, and railroad companies common carriers." Article 244.

And our statute provides that "it shall be lawful for any number of persons not less than six * * * to form themselves into and constitute a corporation for the following purposes, to-wit: For the contruction and maintenance of *railroads,* canals, plank roads, *bridges,* ferries and *other works of public improvement.*" R. S., Sec. 683.

It is thus established upon the authority of the Constitution and the statutes of this State, that the term "railway enterprises" occur-

ring in Art. 242, as well as "bridges," occurring in Art. 209, are "works of public improvement," in the sense of the latter.

The differences between the two articles are the following, namely, that Art. 209 provides that the proposed increase of the rate of taxation shall be "submitted to a vote of the property taxpayers of *such parish*," while 242 provides that same shall be authorized "by a vote of the majority of the property taxpayers *in numbers and in value*," omitting the *parish;* and that Art. 209 provides that the property taxpayers shall be those only who are "entitled to vote under the election laws of the State, and a majority of same voting at such election shall have voted therefor," while Art. 242 is silent on the subject.

Attention has been attracted to the fact that while Art. 209 places no limitation upon the rate of the proposed increase, yet Art. 242 fixes the rate of increase at five mills, and the period of its duration at ten years.

Taking the latter supposed difference first, it can, in our opinion, be readily reconciled, upon the hypothesis already suggested, that Art. 242 was a grant of power to the General Assembly to deal with the subject of special taxes, and that power is subject to the limitation contained in the *proviso.*

That *proviso* affording a check upon the General Assembly, it is powerless, " under *(any)* circumstances," to pass the limit therein set.

Considering, in the second place, the other supposed difference, we find it distinctly covered by a decision of our predecessors; we refer to the case of Surgett vs. Chase, 33 An. 833, wherein the question was of the legality of a special tax for the purpose of building a public levee, which had been "submitted to a vote of the property taxpayers" in supposed conformity to the provisions of Art. 209, omitting the limitation of Art. 242 "in numbers and in value."

In that case the court, in its original opinion, said:

"It requires no reasoning, or authority to satisfy the legal mind, that any legislation which would have attempted to confer on police juries the power to build public levees * * * would be glaringly unconstitutional, and could not be enforced by the courts unless the authority be found in Arts. 209 or 242. * * *

"Construing these two articles in connection with Art. 215," etc., the court announced that the foregoing conclusion was confirmed.

Following up that theory the court quoted Art. 242 in its entirety and made the following observations thereon, viz.:

"Now, as the project of levying this special tax is shown to have been submitted to the majority of the taxpaying electors of the parish, and not to the majority of the taxpayers of the parish *in numbers and in value* as imperatively required by that article  *  *  *  defendants can not invoke the authority of that article."

In other words, the court held that the defendants had submitted the question of levying the special levee tax to the majority of the taxpaying electors in keeping with the provisions of Art. 209, but had failed to procure "a vote of the majority of the property taxpayers in numbers and in value," as provided in Art. 242.

That this *was* the evident purpose and intended scope of that opinion is fully verified by the opinion on rehearing, wherein MR. JUSTICE FENNER, speaking for the court, said:

"The proposition that Art. 209 is self-operating, and confers directly upon the parishes the absolute power to levy *unlimited* taxes for the purpose therein specified upon the vote of a mere numerical majority of the taxpayers, without reference to the value of the property represented, is certainly startling."

It is rarely the case that so much force and meaning are couched in such few words.

But for the construction the court placed upon the provisions of Art. 209, the consequences apprehended would inevitably flow from it.

If Art. 209 is *not* self-operating it is because Art. 242 confers upon the General Assembly the power to put it in force.   If Art. 209 does *not* authorize unlimited taxes for the purposes specified therein, it is because the *proviso* of Art. 242 prevents.

If Art. 209 does not authorize a mere numerical majority of the property taxpayers, without regard to their number or value of property represented, it is because the restraint is imposed by Art. 242.

On the other hand, if only those property taxpayers of a designated parish, who are entitled to vote under the election laws of the State, are entitled to participate in an election held in pursuance of Art. 242, it is because *that* condition is imposed by Art. 209.

To our minds, the force of the conclusions the court arrived at in that case is irresistible; and we accept them as absolutely conclusive on the proposition that Arts. 209 and 242 *are laws in pari materia.*

Accepting this conclusion as correct, it necessarily follows that the

concluding sentence of Art. 209 controls this case, viz.: "And a majority of the same voting at such election shall have voted therefor."

But that opinion is not alone. There are others.

In Duperier vs. Viator, 35 An. 957, the contention was "that the majority of the taxpayers of the parish did not vote in favor of the tax as required by Act 126 of 1882;" but, notwithstanding the proof disclosed that a number less than a majority of the property holders *participated* in the election, the court said:

"In our opinion, this language"—that of Art. 209, quoting same— "is liable to no other construction (than) that the tax must receive the vote of the majority of the taxpayers *who voted at the* election; or, in other words, the *majority of the legal votes cast at the election,*" etc.

That decision goes further than the exigencies of the instant case require, for the reason that at the election under consideration there was a large majority of the property taxpayers, in numbers and in value, who participated in the election; and a large majority of those participating voted in favor of the tax.

In McKenzie vs. Tax Collector, 39 An. 944, the court had under consideration the identical question we have before us—the legality of a special municipal tax, which had been l.vied in pursuance of an election held in 1887, in aid of the construction of a railroad connecting the town of Minden with the main line of the Vicksburg, Shreveport & Pacific Railroad, passing through a portion of the parish of Webster.

In dealing with the question the court said:

"Articles 242 and 209 being *in pari materia* (they) must be construed together; and the latter provides that the levying of a special tax shall be submitted to a vote of the property taxpayers of such parish or municipality entitled to vote under the election laws of the State.

"In Duperier vs. Viator, 35 An. 957, this court held that the property taxpayers entitled to vote are only those who are entitled to vote at a general election."

This case is in exact keeping with that of Surget vs. Chase and Duperier vs. Viator.

In 1884 there was submitted to the electors of the State the subjoined amendment to Art. 214 of the Constitution, namely:

"No. 112.          JOINT RESOLUTION.

" Be it resolved, by the General Assembly of Louisiana, two-thirds of the members elected to each house agreeing thereto, That at the general election next ensuing the passage of this resolution, the following amendment to Art. 214 of the Constitution of this State shall be submitted to the people of this State, and if a majority of voters at said election shall approve and ratify such amendment, the same shall become a part of the Constitution of the State, to-wit: That Art. (214) two hundred and fourteen of the Constitution be amended so as to read as follows:

" The General Assembly may divide the State into levee districts and provide for the appointment or election of levee commissioners in said districts, who shall, in the method and manner to be provided by law, have supervision of the erection, repair and maintenance of the levees in said districts; to that effect the Levee Commissioners may levy a tax not to exceed ten mills on the taxable property situated within the alluvial portions of said district subject to overflow; provided, that in case of necessity to raise additional funds for constructing, preserving or repairing any levees protecting the lands of a district, the rate of taxation herein limited may be increased, when the rate of such increase and the necessity and purpose for which it is intended shall have been submitted to a vote of the property taxpayers of such district, paying taxes for himself, or in any representative capacity, whether resident or non-resident, on property situated within the alluvial portion of said district subject to overflow, and a majority of those in number and value, voting at such election, shall have voted therefor."

From an examination of the act of the Legislature it will be seen that it was to be " submitted to the people of the State, and if a majority of the voters at said election shall approve and ratify such amendment, the same shall become a part of the Constitution;" and the proposed amendment declares that for the purpose of constructing, preserving or repairing any' levees, " the rate of taxation herein limited may be increased, when the rate of such increase and the necessity and purpose for which it was intended shall have been submitted to a vote of the property taxpayers of such district * * * and a majority of those in number and value, voting at such election, shall have voted therefor."

28

In Munson vs. Board of Commissioners, etc., 43 An. 15, this court had under consideration, and determined the constitutionality of, Act 97 of 1890, which directed the levy and collection of certain acreage and produce taxes; and therein was drawn in question the legal operation and effect of the aforesaid constitutional amendment.

It was the contention of plaintiffs' counsel, in that case, that said legislative act was unconstitutional, because its provisions conflicted with those of the aforesaid amendment; and that it provided for a local assessment, and not a tax *eo nomine*, and was, consequently, different from Art. 209 of the Constitution.

In deciding that question this court said:

" When, however, a question arises of the necesssity for increasing the burden of taxation for *any* purpose whatever, it is meet and proper that the property taxpayers of the district within which the increase is proposed should be consulted. And we take it to be quite a significant circumstance that there was incorporated in the amendment to Art. 214, the identical provision which is contained in Art. 209, directing that any increase of the rate of taxation therein limited shall be first submitted to a vote of the property taxpayers. It seems to be indicative of the taxing power which is conferred in *each* article; each being designed for similar specific purposes—the erection of a court house or the construction of a levee."

See also Charnock vs. Levee Company, 38 An. 323; Planting and Manufacturing Co. vs. Tax Collector, 39 An. 455; and Levee Commissioners vs. Lorio Bros., 33 An. 276, in which analogous principles are announced.

In Barber Asphalt Paving Company vs. Gogreve, 41 An. 251, this court distinctly held, that " the provisions of Art. 209 of the Constitution have *exclusive* reference to *ad valorem* taxation for the purposes of revenue, and do not apply to special assessments for street improvement."

It thus apppears evident that by an uniform and consistent course of decision, during a period of fifteen years, this court has maintained the principle of consistency and similarity in these several articles relating to an increased rate of *ad valorem* taxation for the purposes of public improvement; so that they have thereby become a unit— the provisions of one being, as it were, read into the other.

Evidently being mindful of the jurisprudence of the State upon this

question, the Legislature of 1894 proposed an amendment to Art. 242 of the Constitution so as to make it *read* just as it had been *interpreted* to mean, viz.:

"The General Assembly shall have power to enact general laws authorizing the parochial or municipal authorities of the State, under certain circumstances, by a vote of a majority of the taxpayers in number and amount *voting at the election* to levy special taxes in aid of public improvements or railway enterprises, etc." (Our italics.)

Notwithstanding this proposed amendment was, with various others, defeated at the general election held in 1896, it evidences as well as sanctions the interpretation that this court had theretofore placed upon Arts. 209 and 242, as being *in pari materia*.

Counsel have argued, and our learned brother of the District Court was of opinion, that this court entertained a somewhat different view of this question, in Sentell vs. Police Jury, 48 An. 96; but that is an erroneous supposition.

The case before the court was similar to some of the contestations we have referred to; but the court dealt with certain exceptions which the defendants had interposed in the lower court, and two of which the District Judge had sustained and dismissed the suit-misjoinder of the plaintiffs, and no cause of action.

In the course of our opinion we said:

"The exception of misjoinder is based upon the fact that some of the plaintiffs are residents of Avoyelles, and others of Orleans and St. Landry. All are alleged taxpayers."

And after approving the opinions expressed in McKenzie vs. Tax Collector, and Duperier vs. Viator, the opinion proceeds as follows, viz.:

Article 242 "deals with elections for railway enterprises, and in our view entitles taxpayers to vote. The *act* (of 1886) which puts this last article into effect, provides for the votes of non-resident taxpayers. We think that taxpayers, whether resident or non-resident, *were properly joined as plaintiffs*."

It must be observed that the opinion says that Art. 242 " entitles *taxpayers* to vote;" not non-resident taxpayers. It speaks of the Act of 1886, providing for the votes of non-residents "—an altogether different proposition. And the conclusion of the court was, "that taxpayers, whether resident or non-resident, *were properly joined as plaintiffs;* not that they were capacitated to vote.

Having arrived at this conclusion, the court reversed the judgment, reinstated the case and remanded it for a trial upon the merits. But after the case went back to the District Court, a voluntary non-suit was entered and nothing passed by our decree.

But as neither Art. 209 nor 242 makes any provision for the method of holding elections thereunder, nor of ascertaining the results thereof, nor for the contesting of same, the Legislature is empowered by the latter article to deal with those questions as it deems best.

Consequently it was within its competency to declare who were capacitated to institute an election contest in order to have it declared void on the ground of the non-performance of certain conditions precedent, notwithstanding it was absolutely without power to prescribe the qualifications of persons to vote.

Hence in the case of Sentell vs. Police Jury, it was with the capacity of the plaintiffs to institute suit and stand in judgment, that we dealt, and not with their constitutional qualifications to vote. The latter question was one for the merits alone, and they had not been reached and had not been disposed of in the court below.

In keeping with that theory Act 106 of 1892 provides that "any election held under Arts. 209, 242 and 250 of the Constitution * * * may be contested by *any* party or parties in interest on the grounds of fraud, illegality or irregularity, before any court of competent jurisdiction." *Id.*, Sec. 1.

It provides that all property taxpayers have the capacity of *suitors*, whether non-residents, minors, married women, interdicted, insane or convicted persons; and surely such persons should enjoy the right to demand judicial relief from the payment of a tax on the ground of its nullity, which they had not the qualifications as voters to primarily resist at the polls. For, in this way, the equality of all property taxpayers would be in a great measure preserved; and the existence and recognition of that right would have a tendency to restrain and repress illegality and informality in the conduct of elections.

After careful consideration of the articles of the Constitution and all the adjudged cases in our reports appertaining thereto, we are prepared to affirm the opinions we have quoted and to adhere to the principles therein announced.

## II.

But, pretermitting all reference to Art. 209, and confining the discussion *arguendo*, to the provisions of Art. 242, let us consider the phrase "by a vote of the majority of the property taxpayers, in numbers and in value," and ascertain its true meaning.

It is quite significant, indeed, that the phrase is, "by a vote of the majority of the property taxpayers," etc., instead of " by a vote of the majority of *all* the property taxpayers," etc.

Between such phrases as these two, a difference has been taken by nearly all of the courts whose opinions we have examined on the subject, and with the proximate result, that in cases where the word *all* is omitted, the decisions have been, that a majority of those actually voting carries the election in favor of the tax, those not voting being presumed to have acquiesced in the result; whilst in those cases in which the word *all* occurs, an affirmative vote of *all* the property taxpayers is requisite for that purpose.

The following decisions of some of the courts of other States will serve to illustrate the foregoing propositions.

They are founded upon the precepts of text writers of the first ability, the trend of which may be summarized thus:

That the rule to guide those to whom the question is submitted is, to take the majority of votes cast as a test—those who remain away from the polls being presumed to assent to what is done by a majority of those who vote. Their silence, when they had an opportunity to speak and change the result, is taken for consent to the result. That is the settled doctrine in this country in respect to the election of officers at a general election and, also, at elections for the purpose of deciding any special proposition. McCreary on Elections, p. 114.

The Constitution of Minnesota requiring that a law relative to the removal of a county seat shall, before taking effect, " be submitted to the electors of the county   *   *   *   and be adopted by a majority of such electors," the Supreme Court of that State held that phrase to mean " a majority of those electors voting at the election *   *   *   irrespective of the particular facts appearing in the case," etc.

To the same effect are Taylor vs. Taylor, 10 Minn. 107; Bayard vs. Kling, 16 Minn. 249.

A statute of North Carolina, which authorized aid to be granted railroads upon same having been "voted by a majority of the voters of said town qualified to vote for commissioners," was interpreted by the Supreme Court of that State to mean a majority of the votes actually cast at the election; that all voters who did not choose to participate in the election "are to be taken as assenting to the result of the election, according to the vote actually polled." Reiger vs. Commissioners, 7 N. C. 318.

A Missouri statute required that all propositions "to create a debt by borrowing money for any purpose whatsoever" should be submitted "to a vote of the qualified electors of a city, and that two-thirds of such qualified voters (was necessary) to sanction the same;" and the Supreme Court of that State held it sufficient "if two-thirds of the qualified voters *who voted* at the special election voted in favor of the proposition." State *ex rel.* Bassett vs. Reneck, 37 Mo. 270.

In People vs. Warfield, 20 Ill. 159, the court said:

"The voters of the county referred to were those who should vote at the election authorized. If we go beyond this and inquire whether there were *other voters* of the county who were detained from the election by absence or sickness, or who voluntarily absented themselves from the polls, we should introduce an interminable inquiry, and invite contests in elections of the most embarrassing and baneful character, if we did not destroy all of the practical benefits of laws enacted under these provisions of the Constitution.

"We hold, therefore, that a majority of the legal votes cast at this election is sufficient to determine the question of a relocation of the county seat."

In Railroad Company vs. Davidson County, 33 Tenn. 636, it was held:

"When a question of an election is put to the people of a county, and is made to depend upon the vote of a majority of the voters of said county, the only proper test of the number entitled to vote in such election is the result thereof as determined by the ballot box."

In Sanford vs. Prentice, 28 Wis. 358, it was held that "a majority of the legal voters of a district 'meant' only a majority of those actually voting at the election."

In Vance vs. Anstell, 45 Ark. 400, the court held that the phrase "without the consent of a majority of the qualified voters of the

county " meant " a majority of those actually voting at the elec-
tion."

In Smith vs. Procter, 130 N. Y. 319, it was held that the phrase " a
majority of *all* the inhabitants of any school district entitled to vote"
meant " a majority of those actually voting," etc.—an exceedingly
strong case.

In People *ex rel.* Freeman vs. Chute, 50 N. Y. 461, the court held:

" Those who are absent from the polls, in theory and practical
result, are assumed to assent to the action of those who go to the
polls and vote; and those who go to the polls and do not vote for
any candidate for office are bound by the result of the action of those
who do, and he who receives the highest number of earnest valid
votes is to be the one chosen to the office."

In Green vs. State Board of Commissioners, the Supreme Court of
Idaho (December term, 1896) had under consideration the question
whether a proposed constitutional amendment permitting women to
exercise the elective franchise had been carried, at an election held
under an article of the State Constitution, and the terms of which
amendment were that a " majority of the electors shall ratify the
same;" and the court held that a majority of those voting was all
the Constitution required, and " that the ten thousand or more
voters who refrained from voting must be taken to have assented
thereto."

And in that case the court further said:

" This is a government by the people, who have opinions, and are
willing to express them. Representatives are elected, both in Con-
gress and the Legislature, constitutions are framed, and laws are
enacted, and of right ought to be, by these men, and by these *only*."

In Walker vs. Oswald, 11 Atlantic Reporter, 711, it was held that
those abstaining from voting " are considered to have acquiesced in
the result, if the measure is adopted (by) receiving a majority of
those voting upon it," etc.

In Dayton vs. City of St. Paul, 22 Minn. 400, it was held " that a
majority of those present and voting shall be sufficient."

Our own court has followed and adopted this interpretation.

In City vs. De St. Romes, 9 An. 57, the question was one relating
to the subscription by parishes and municipalities of the State to the
stock of corporations in aid of works of internal improvement, and
the statute required that such proposition must be submitted to and

ratified by "a majority of the voters on whose property the supposed tax is be levied;" and the court, through Mr. Justice Ogden, held that it was sufficient if it was "approved and ratified by a majority of the votes cast at the election."

It is true that there are many opinions which express a contrary view; but, as before observed, they construe statutes or constitutional provisions which declare that the majority of *all* the qualified electors shall favor the proposition; that is to say, very many of them.

But we do not regard it our duty to attempt to reconcile conflicting views upon the question. In such an emergency we may with safety consult the opinion of the Supreme Court of the United States as the best and final arbiter of all such disputes.

One of the principal cases to which our attention has been directed is County of Cass vs. Johnston, 95 U. S. 360, in which the question for determination and decision was, as to what was the proper construction to be placed upon the Missouri statute known as the "Township Aid Act," which authorized subscriptions by townships to the stock of railroad companies, "whenever two-thirds of the qualified voters *voting at an election* called for that purpose shall vote in favor of said subscription," while the Constitution of that State prohibits such a subscription "unless two-thirds of the qualified voters of the  *  *  *  town, at a regular election held therein, shall assent thereto;" and the court held that the provisions of the Constitution and the statute were substantially the same—specifically overruling the case of Harshman vs. Bates County, 92 U. S. 569, in which a contrary opinion had been expressed.

That a majority of legal voters requires only a majority of the legal voters actually voting at an election is "the established rule as to the effect of elections in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting unless the law providing for the election otherwise declares"—citing with approval St. Joseph Township vs. Rogers, 16 Wall. 644, and many of the cases we have already collated. It will be difficult to find an opinion more completely apposite and authoritative than that.

In Douglas vs. County of Pike, 101 U. S. 677, the Supreme Court had under consideration the constitutionality of the same Missouri

statute to aid and facilitate the construction of railroads; and they were requested to review their decision in County of Cass vs. Johnston, because the Supreme Court of Missouri had decided that statute unconstitutional, notwithstanding the decision in that case favoring its constitutionality.

The court did review the grounds of their decision in County of Cass vs. Johnston, most carefully and thoroughly, and after this examination affirmed its correctness.

In Carroll County vs. Smith, 111 U. S. 556, the question was of the validity and legality of an election held in pursuance of the provision of the Constitution of Mississippi and laws of that State which provide the manner in which counties of that State may grant aid to corporations, and the court said:

"The assent of two-thirds of the qualified voters of the county, at an election lawfully held for that purpose, to a proposed issue of municipal bonds, intended by that instrument, meant the vote of two-thirds of the qualified voters present and voting at such election in its favor, as determined by the official return of the result."

But the most recent expression of opinion by the Supreme Court is that in Knox County vs. Ninth National Bank, 147 U. S. 91, in which Mr. Justice Brown, speaking for the court, said:

"Several decisions of the Supreme Court of Missouri are cited, the latest being that of State vs. Harris, 96 Missouri, 29, in which the court held that two-thirds of those actually voting is not sufficient," but the court said that opinion was erroneous, and adhered to their previous rulings.

Comment is unnecessary, as those decisions are final and controlling; and we hold that on reason and authority that a majority of the property taxpayers in number and value means a majority of those voting at an election.

And thus holding, the election under consideration was legal, and the judgment appealed from is erroneous.

It is therefore ordered and decreed that the judgment appealed from be annulled and reversed; and it is further ordered and decreed that plaintiffs' demands be rejected at their cost in both courts.

NICHOLLS, C. J., rests his concurrence on the ground of acquiescence.

## DISSENTING OPINION.

BREAUX, J. I regret that I am compelled to dissent from the elaborate opinion of the court in this case.

It is conceded, if it is requisite that it be carried by a majority of the property taxpayers in number and amount, the election for the tax was defeated.

The contention of the plaintiff is that it was carried by a majority in number and value of the property taxpayers voting at the election.

The article of the Constitution applying reads: "The General Assembly shall have power to enact general laws authorizing the parish or municipal authorities of the State, under certain circumstances, by a vote of the majority of the property taxpayers in number and value, to levy a special tax in aid of public improvements or railway enterprises," thus requiring, as I think, a majority of the property taxpayers in number and value of property to carry the election,

It is different under Art. 209 of the Constitution, which, in my view, does not apply to railroads. The latter applies to public buildings, bridges, and all works of public improvement in parishes and municipalities. Improvements owned by the respective communities with whose funds they were constructed.

In the latter case, in my judgment, a majority in number and value of the property taxpayers *voting at such election* is the majority required. As I appreciate the issues, acquiescence of the taxpayer in the work done and the benefit received by him are far more persuasive than the construction placed upon the article of the Constitution, viz.: that the required majority in value and amount voting is the majority required.